**FUTURE PLASTICS, INCORPORATED,**
**Appellant,**

**v.**

**WARE SHOALS PLASTICS, INCORPORATED, George W. Massey, D. K. Lee, Jr., W. B. Sprouse, Sr., and William A. Ellege, Sr., Appellees.**

**No. 12651.**

United States Court of Appeals
Fourth Circuit.

Argued Dec. 5, 1968.

Decided Feb. 28, 1969.

---

Clifton T. Hunt, Jr., Greensboro, N. C.

Robert F. Conrad, Washington, D. C. (on brief), for appellant.

Ralph Bailey, Greenville, S. C. (Howard L. Burns, Greenwood, S. C., on brief), for appellees.

Before BOREMAN, BRYAN and CRAVEN, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

Future Plastics, Inc., appeals an order of the District Court for South Carolina dismissing its action unless it accepted the terms of a settlement, which the Court found had been agreed upon between the plaintiff and the defendants. Plaintiff contends that, even assuming a binding contract of compromise had been made, still the Court should not have allowed it to defeat the action. The point is that before the trial date and the tender of the contract to the court, it was uncontrovertibly clear that, without plaintiff's fault, a material provision of the contract could not be effectuated.

We sustain this contention. Before reliance upon it, the contract had failed in its intendment as an accord and satisfaction. Even though it represented an accord in the beginning, satisfaction under its terms became impracticable because of consequent unforeseeable income tax burdens. In the circumstances the contract should not have been upheld as a bar to the action.

Future Plastics commenced this diversity action against Ware Shoals Plastics, Inc., and several individuals for relief against their alleged unfair competition and wrongful expropriation of confidential information and trade secrets. Defendants counterclaimed for damages for slander by plaintiff's representatives and for harassment of the defendants by this suit. The trial was scheduled for April 16, 1968.

Upon adjournment of a pre-trial conference on March 14, 1968, a defendants' attorney informally opened discussions with counsel for plaintiff for a possible composition of their differences. This led to a private meeting between the litigants, purposely without their attorneys, in Ware Shoals, South Carolina, on March 19, 1968, at the suggestion of the plaintiff's president. Later in the day the parties met again, this time in the Greenville, South Carolina office of defense counsel, with all lawyers present.

At these conferences, the parties apparently worked out, at least, a basis for settlement. Prominent among the terms was that defendants would pay plaintiff $50,000.00 as a single license fee for the

future use of plaintiff's trade secrets, and plaintiff would pay defendants $50,000.00 for release of the counterclaims. This equality in exchange of moneys was framed to effect a reciprocal and mutual "wash-out" of liabilities. However, Future Plastics also desired to have it serve as a warning, when publicized, to deter· others from stealing their formulas.

The District Judge found that the following terms had been agreed upon at the conclusion of these meetings:

"1.A. Defendants would enter into a Consent Judgment providing:

"(1) Plaintiff has good and valuable trade secrets relating to the production of high molecular weight polyethylene;

"(2) Defendants obtained these trade secrets from plaintiff as a direct result of [one] Massey's employment by plaintiff;

"(3) Defendant Massey has disclosed the trade secrets unlawfully and defendants have used these trade secrets unlawfully, all to the detriment of plaintiff;

"(4) Defendants would be enjoined from using or disclosing the trade secrets;

"(5) The defendants' Counterclaim would be dismissed with prejudice.

"B. Plaintiff would grant defendants a license to use the trade secrets and defendants would agree in writing to keep the trade secrets and not disclose them to anyone.

"C. Defendants would pay plaintiff Fifty Thousand Dollars ($50,000) as a paid-up license fee and plaintiff would pay defendants Fifty Thousand Dollars ($50,000) for a release from the slander charge and other counterclaims.

"4.A. Plaintiff was to acquire Twenty Per Cent (20%) of the stock in Ware Shoals Plastics, Inc. on signing the settlement papers in addition to the Fifty Thousand Dollars ($50,-000) license fee.

"5.A. Plaintiff would furnish defendants raw material comprising reground plastic material to be processed by defendants, and defendants would be allowed a wastage factor of One Per Cent (1%), of the raw material.

"B. The amount of plastic defendants would process for plaintiff was reduced to an amount which would give defendants Five Thousand Dollars ($5,000) for the use of their machine based on a rate of Thirty Cents ($.30) per pound over a period of one (1) year.

"C. Defendants were to have the right to buy back all of their stock from plaintiff within thirty-one (31) days after one (1) year at an agreed price of Twenty-Five Hundred Dollars ($2,500.00).

"D. Plaintiff's rights as a stockholder would not include the right to see customer lists or the defendants' manufacturing facilities.

"E. Plaintiffs' right to buy Ware Shoals Plastics, Inc., at its then book value in the event of an offer for sale was limited to the first five (5) years following the agreement with plaintiff having the right during the succeeding five (5) years to the first refusal of any bona fide offer.

"F. Plaintiff would not bring any action for patent infringement against defendants based on use of their existing extruder, but this freedom of suit for patent infringement was to be personal to the defendants and not transferrable in the event of a sale of the company at any time.

"G. The purchase of the defendant company by the plaintiff would bind the individual defendants from using or disclosing the trade secrets."

Plaintiff concedes that all of the terms set forth in the opinion of the District Court had been agreed upon when the two meetings of March 19,

1968 terminated. As the afternoon meeting in Greenville wound up, the parties agreed that defendants' attorney should inform the District Court of the settlement, to permit its trial calendar to be rearranged for April 16. A meeting of the parties and attorneys was fixed for March 22, 1968 in Greenville to sign the settlement papers. One of defendants' attorneys advised the attorney for Future Plastics to consult a tax expert for the tax aspects of the $50,000.00 interchange. Defendants agreed to let the agreement's form remain elastic to allow resort to tax minimizing formulas. A defense attorney remarked to the plaintiff that "if the $50,000.00 payment for slander was a problem, then we would sell them something else."

A specialist was consulted the following day, March 20, 1968, and told of the arrangement. He was of opinion that the $50,000.00 trade could mean a tax loss to Future Plastics. The money received from the defendants as a license fee might be treated, he said, as ordinary income instead of a capital transaction. He further advised that a deduction for the amount paid to the defendants for release of the defamation complaint might not be allowed, since the liability sprang from the fraudulent or wrongful acts of its agent. The projected trade of $50,000.00 sums could, he estimated, cost Future Plastics $25,000.00 in taxes.

Immediately upon learning of the probability of these adverse tax consequences to Future Plastics, its attorney informed defendants' lawyer, on March 20, 1968, that for this reason the terms laid out the day before were unacceptable. Future Plastics' counsel suggested as an alternative to the $50,000.00 payment by the defendants, that the 20 per cent of Ware Shoals stock, mentioned in findings 4.A and 5.C, supra, be retained by Future Plastics for five years instead of one, after which the defendants could repurchase it at the then book value instead of the $2,500.00 figure previously agreed upon. Defendants still preferred the $50,000.00 exchange, but urged that tax advisers of each side confer on the tax issue.

Also, on March 20, a defense attorney notified the District Court that a settlement had been arrived at. He explains that he, his associates and his clients considered their differences with Future Plastics as composed by the agreement. The question of taxes, they thought, was a matter alone for the plaintiff's resolution, although defendants were, and still are, ready to modify the money-exchange provision, as the plaintiff may wish, to remove the taxation fear.

Defendants' expert suggested to his counterpart that a settlement might be shaped, advisably tax-wise, so that Future Plastics would get capital gains tax treatment of the $50,000.00 received for the license, and might deduct its expenditure of $50,000.00 as a business expense. However, this entailed the grant of an exclusive license to the defendants for, at least, a small area, so that the transaction would take the form of a sale of the trade secrets. This variation was unacceptable to Future Plastics.

On March 22, the attorneys submitted to their opposites drafts which each thought embodied the terms of the contemplated settlement. The defendants' submission included a stipulation not only for the $50,000.00 exchanges, but also for the exclusive license in their favor; the plaintiff's included a provision increasing its hold on the corporate defendant's capital stock in lieu of the $50,000.00 swap. Future Plastics objected to the conferment of any exclusive license upon the defendants and to the continued tax exposure. Negotiations continued until March 26, when both parties advised the District Court that a final agreement had not been achieved.

On April 16, 1968—the date originally assigned for the trial—the case came on for hearing upon whether the parties had come to an agreement. Then put before the Court was a narrative of all meetings and understandings, with all

the preceding and subsequent episodes, as well as the contract drafts proposed by the attorneys in an effort to memorial the alleged agreement. Upon this submission the Court concluded that the "parties entered into a valid and binding settlement agreement on March 19, 1968" and that the tax consideration had not been made a condition or prerequisite to a final agreement. The Court decreed that unless the plaintiff accepted the agreement as declared by the Court, the suit would be dismissed.

■■ Undoubtedly, a court may and must pass upon the validity of a stipulation asserted as compounding the litigants' controversy. Such an agreement, executed or executory, disposes of the pending suit; the agreement fulfils the mutual and reciprocal claims of the parties. Cia Anon Venezolana de Navegacion v. Harris, 374 F.2d 33, 35 (5 Cir. 1967); Kelly v. Greer, 365 F.2d 669, 671 (3 Cir. 1966); W. T. Ferguson Lumber Co. v. Elliott, 171 S.C. 455, 172 S.E. 616 (1934).

■ Presently, there is no question of the truth of the representations by the parties to the Court or of the accuracy of the factual premises stated by the Court. Indeed, it may be assumed that a valid contract in compromise had been made between the plaintiff and the defendants. The point is, however, that when it was adduced to the Court in bar of the plaintiff's suit, it was evident that a foremost provision of the contract —equal swap of moneys—could not be accomplished with the equality the parties had planned. The question then arose as to how the Court should treat the contract. We think it no longer constituted an accord; we think the trial court should have relieved the plaintiff of the force, ex facie, of the agreement. Equity conferred and required the exercise of this power.

From the beginning, the parties envisioned an interchange of moneys in a manner devoid of gain or loss to either. The sums were to be equivalents in the hands of the recipients. Indisputably the common concept of the agreement was that the compensation for the license and the recompense for the tort would cancel each other. But when this pervading purpose was found unattainable, it did not give the defendants the right to insist upon the exchange, or to replace it with other terms, no matter how attractive the alternative.

In argument at the bar the defendant-appellees tell us that they are willing to reduce the exchange to $1.00 or otherwise modify it to obviate the plaintiff's tax worry. Indeed, they explain that this was their purpose in suggesting an exclusive license, but that they do not insist upon either provision. Thus, they conclude, there is no ground for the plaintiff's refusal to abide by the contract. Despite the fairness of these concessions, if availed of they would not restore the initial and joint intent that the moneys should be received in perfect equality. Nor would they provide the in terrorem effect—deterrent upon others —of the apparent exaction of damages of $50,000.00. Nor could any other contract be imposed upon the plaintiff at the risk of dismissal of the suit if not accepted.

As heretofore emphasized, the obstruction did not come about through plaintiff's fault. In truth, it was not simply a unilateral mistake. Plainly, both parties assumed that the stipulation could be performed with entire equality. Thus, it was a mutual mistake. But whatever the category, this court in the circumstances should not allow it to prejudice the plaintiff. A somewhat similar predicament was resolved in Brast v. Winding Gulf Colliery Co., 94 F.2d 179, 181 (4 Cir. 1938), in which we said:

"Where facts subsequently developed show, with respect to a particular matter, that a stipulation was inadvertently signed, the party may be relieved where there is no prejudice to the opposite party. Carnegie Steel Co. v. Cambria Iron Company, 185 U. S. 403, 22 S.Ct. 698, 46 L.Ed. 968.

" 'If we have any power at all to reverse an order of the District Court relieving a party from a stipulation, we see no reason to do so in this instance. Such stipulations are not as irrevocable as other contracts, and courts will not hold the parties to them when they are given inadvertently and are oppressive, and when the other side will suffer no unfair prejudice if they are set aside. [Citations.]' Dalton v. Bowers, 2 Cir. 53 F.2d 373, 374."

Later, in Hester v. New Amsterdam Casualty Company, 268 F.Supp. 623, 627 (D.S.C.1967), District Judge Russell made this comment, apt here:

"To deny a party the right to be relieved of an executory agreement made in connection with a suit, which agreement was made as a result of unilateral 'mistake, inadvertence, surprise or excusable neglect' and which may be vacated without prejudice to the other party, would be contrary to the liberal policy established by Rule 60(b) of the Rules of Civil Procedure. It would certainly be an anomalous situation and an obvious, injustice, if relief from a judgment, agreed to because of a unilateral mistake or inadvertence, might be had under Rule 60(b) but similar relief from a settlement agreement, especially where, as here, it was contemplated it would subsequently be incorporated in an order and judgment of the Court, could not be had. No logical reason would invest an agreement of the parties, unconfirmed by the Court, with greater standing than a solemn judgment of the Court based on the agreement of the parties. While, of course, Rule 60(b) does not apply to this situation, it is expressive of a judicial policy which should be given weight in dealing with motions of this character and which represents the modern trend in the decisions."

The possibility of harm to the defendants by the vacation of the stipulation is not grave. The trial court found potential hurt to the defendants because the "defendants [would find themselves] in a much less advantageous position to negotiate a settlement than he was before the order of vacation". This contingency is not, in our judgment, sufficient to prevent the restoration of the parties to the position they occupied in the District Court before the stipulation was advanced to the Court. Nor can dismissal of this case be reconciled on the need of the trial court to dispatch disposition of the cases on its docket, as was done in Reid v. Prentice-Hall, Inc., 261 F.2d 700 (6 Cir. 1958).

In view of our conclusions as noted, there is no occasion to consider the evidential ruling of the District Court which was pressed as error by the appellant. The order on appeal must be vacated, and the action remanded for trial on the original pleadings. The plaintiff will bear its costs, and the defendants theirs, in the District Court and on this appeal.

Vacated and remanded.